**Clyde THOMPSON, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–73–225.**

Court of Criminal Appeals of Oklahoma.
Jan. 23, 1974.

 

Ernest R. Anthis, Jr., Muskogee, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Stan Chatman, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Clyde Thompson, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court, Muskogee County, Case No. CRF–72–299, for the offense of Rape in the First Degree; his punishment was fixed at twenty (20) years imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, Dr. Marvin Hird testified that in the early morning hours on November 17, 1972, he did a pelvic examination of the prosecutrix at the emergency room of the Muskogee Hospital. He discovered spermatozoa and determined that intercourse had taken place. On cross-examination, he testified that he did not make a determination whether the sperm was alive or dead.

The prosecutrix testified that on November 16, 1972, at approximately 3:30 a. m., she was sleeping with her one-year old child, on a mattress on her living room floor. Her husband, who worked the late night shift, had left for work at midnight. She awoke and became aware of another's presence lying next to her. A man's voice said: "Don't say anything, just lay there and be still, I've got a knife—I won't hurt you." (Tr. 71–72). The man further said that he had been watching her for several days and that he had to have sexual intercourse with her. She testified that the man then proceeded to rape her and that penetration had occurred. She further testified that she was able to see the man's face even though the only light in the living room came from the outside porch light and a light left on in the bathroom. She identified the defendant as the attacker. Immediately after the defendant left, she called her husband and the police.

On cross-examination, she testified that she was shown approximately 10 or 12 pictures of different individuals from which she identified the defendant, and went through two lineups at which she identified the defendant at the second lineup.

Detective Louis Bradley testified that during the days following the incident he showed the prosecutrix approximately 40 or 50 pictures and conducted two lineups in which the defendant appeared in the second lineup. After the defendant was identified at the second lineup, he was placed under arrest.

Officer Rainbolt testified that he investigated the incident, arriving at the scene at approximately 4:15 a. m. He observed pry marks on the back door of the residence.

For the defense, Detective Bradley was recalled and testified as to other police investigations wherein a similar modus operandi was used. He denied that one Taylor had confessed to previously breaking into the prosecutrix's home.

The prosecutrix was recalled and testified that her home had been broken into before, and that one of the persons involved was a person by the name of Taylor.

Frank Gardenhire, defendant's uncle, testified that during the month of November, 1972, he and Sam Starnes rode to work in Tulsa with the defendant. They left at approximately 6:30 a. m. each day. On the day of the rape the defendant picked him up for work as usual.

On cross-examination, he testified that he did not know of the defendant's whereabouts during the early morning hours of November 16, 1972.

Sam Starnes' testimony did not differ substantially from that of witness Gardenhire.

Margie Thompson, defendant's wife, testified that on November 15, 1972, defendant came home, watched TV and then went to sleep. She awoke defendant at approximately 12:30 a. m. and they went to bed. She testified that she was a light sleeper and if defendant had arose in the early morning hours, she would have been awakened.

The defendant testified that on November 15, 1972, he came home from work at approximately 6:30 p. m. He ate dinner and went to sleep while watching TV. His wife awoke him and they went to bed. He arose the next morning and went to work. He denied ever seeing the prosecutrix before he observed her at the lineup.

■ The first proposition asserts that the trial court erred in not sustaining defendant's Motion for Mistrial as a result of a statement made in testimony given by Officer Bradley. The record reflects the following transpired on direct examination:

"Q. And then you concluded that part of your investigation. What did you do next in connection with your investigation?

A. Well, I went and tried to find some black males that might have fitted that description who had records of rape and burglaries and what not." (Tr. 133)

We need only observe that although the witness' response was highly improper, defendant did not make a timely objection. The record reflects that the defendant waited until the conclusion of the direct examination before voicing an objection. In Campbell v. State, Okl.Cr., 462 P.2d 349, Judge Brett stated:

"It is also observed from the record, that the testimony defendant complains of in his brief was not timely objected to by defendant, during his trial. It comes too late to enter an objection, after the witness had completely unfolded his testimony and then attempt to prevent the jury from considering the same, as was done in the instant case."

In McDonald v. State, Okl.Cr., 489 P.2d 776, we stated in the second paragraph of the Syllabus:

"Purpose for either side entering objections and preserving exceptions to adverse rulings is: First, to permit the trial judge to exercise his discretion concerning the admissibility of testimony; and secondly, to preserve adverse rulings for appeal."

In the instant case defendant failed to raise a timely objection, thus denying the trial court the opportunity to admonish the jury to disregard the improper remark.

■ The second proposition contends that the trial court erred in not sustaining defendant's Motion for Mistrial as a result of a statement made by the court bailiff in the presence of the jury. The record reflects that at the conclusion of a recess, and while the jury was being empaneled in the jury box, a bailiff came into the courtroom and announced to the court: "I have called the jail and they have informed me that the prisoner is being brought up." (Tr. 66).

The defendant timely moved for a mistrial, which, in overruling, the trial court stated:

"For this reason that I do not believe that his voice was sufficiently loud enough for the jury to hear it and I don't believe they did hear it."

In denying defendant's Motion for New Trial, the trial court stated:

"I have instructed the bailiff not to say that again but I believe the jury did not hear it and for the further reason that by the defendant's own counsel it was brought out that he was in the county jail at the subsequent time in the trial." (Tr. 328).

We concur with the trial court's conclusion that even if the jury had heard the bailiff's remark, that the same was not prejudicial in view of defendant's testimony on direct examination that he had been con-

tinually incarcerated since the date of his arrest.

 The final proposition asserts that the trial court erred in refusing to hear testimony at the hearing for new trial, regarding misconduct and error on the part of the jury in conducting experiments during their deliberations. The record reflects that at the hearing on defendant's Motion for New Trial, defendant attempted to call the jury foreman offering to prove that the jury, during deliberations, conducted experiments to determine whether they could recognize one another by turning lights on and off in the jury room. In United States v. Hephner, 410 F.2d 930, wherein the defendant argued for reversal because the jury had conducted experiments in the jury room, where one juror covered his head and put on sunglasses in a manner similar to that alluded to by the defendant in the instant case, the court stated:

"Defendant cites a number of cases holding that experiments by a jury which amount to receiving evidence which was not presented at trial vitiates the verdict. The Government cites a number of cases which declined to overturn verdicts on the basis of jury experiments of a nature similar to that in the instant case. On the record before us, we cannot say that the simple experiment alleged by defendant was prejudicial or affected the verdict. Jurors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict. In a case, such as here, where there was ample positive identification, as well as circumstantial evidence, the verdict, which is fully supported by the evidence, will not be disturbed on such tenuous grounds."

We further observe that the juror's actions were invited by defendant's closing argument. The defendant's attorney remarked, during the closing argument, that he had awakened the previous evening, and was not able to recognize the features of his wife in the semi-darkened room. The defendant's attorney further stated:

"O.K. So I got—well, that's what I have thought about and what I experimented with while worrying about this situation. So then I have started to go back to sleep, but before I did I reached over to kiss my wife and when I did I blotted out all her features. In other words, when I went to kiss her I then have no features. The ordinary I think run eye test for this, they put this thing out there and you can read this card. So then they bring it to you and if you can read it and it gets there there's something wrong with your eyes. I mean see, I can recognize my hand right there, but when you put it right there I don't know whether it's mine or somebody else's. O.K., that's right. Of course, I already knew about kissing my wife. When you get right there if I, I mean I am serious as I can be. *I am calling on your human experience and you are to use that human experience* when you get right there if that's your identification not knowing, not talking about knowing, talking about get them out of there and say who was that, can't be done. It can't be done to moral certainty." (Tr. 288) [Emphasis added].

In conclusion, we observe that the record is free of any error which would require reversal or justify modification. The judgment and sentence is affirmed.

BLISS, P. J., and BRETT, J., concur.